IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DIANA LEWIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2339 |
| | § | |
| SAN JACINTO COUNTY APPRAISAL | § | |
| DISTRICT and CLAYTON ADAMS, | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM AND ORDER

Pending are Defendant Clayton Adams's Motion for Summary Judgment (Document No. 27), San Jacinto County Appraisal District's Motion for Partial Judgment on the Pleadings (Document No. 9), and San Jacinto County Appraisal District's Motion for Summary Judgment (Document No. 28).[1]  After reviewing the motions, response, replies, and the applicable law, the Court concludes as follows.

I. Background

This is an action under 42 U.S.C. § 1983 and under the Texas Whistleblower Act, Texas Government Code § 554.001 *et seq.*, for wrongful constructive discharge in retaliation for Plaintiff's complaint of alleged misconduct.  At the relevant time, Plaintiff

---

[1] San Jacinto County Appraisal District also objects to portions of Plaintiff's summary judgment evidence. *See* Document No. 36.  However, because the District is entitled to summary judgment even if Plaintiff's summary judgment evidence *is* considered, the objections to the evidence need not be ruled upon.

was the customer service manager for Defendant San Jacinto County Appraisal District ("District"), the political subdivision of the State of Texas whose function is to appraise property values in San Jacinto County for taxation.[2]  Plaintiff was responsible for answering taxpayer questions, handling complaints, explaining processes to taxpayers, and related duties.[3]  During her employment, Plaintiff became concerned about instructions she alleges that her boss, Defendant Clayton Adams ("Adams"), the District's chief appraiser, gave to her.  When taxpayers would come into the District's office to protest their appraised value, Adams instructed her and other employees to lie to the taxpayers, telling them that they had received a notice of their appraised value and that the deadline for protest had passed, when in fact the District's computer system reflected that the taxpayers had not been sent notice.[4]

Plaintiff contacted two members of the District's Board of Directors (the "Board"): Board President Fielding Browder ("Browder") and Director Jimmy Smith ("Smith").  She discussed Adams's alleged misconduct as well as other concerns about the operation of the office, whereupon Browder encouraged her to submit

---

[2] *See* TEX. TAX CODE ANN. § 6.01(a) & (b).

[3] Document No. 28, ex. A at 24-26 (Lewis Depo.).

[4] *See* Document No. 34, ex. F ¶ 7 (Lewis Affidavit); Document No. 33, ex. B at 30 (Davis Depo.).

the allegations in writing so that the Board could act on her complaint.[5] Plaintiff also discussed her allegations with Susan Bailes, another board member.[6] Plaintiff made her written complaint to the District's Board of Directors about January 21, 2009, informing it of Adams's instructions and other alleged misconduct at the office, such as potentially favorable tax treatment for the family and friends of employees.[7]

After receiving the complaint, the Board met with Lewis to discuss the allegations; Browder told Plaintiff to notify him if she had any problems as a result of her complaint.[8] The District's attorney provided a copy of the complaint to Adams, and the Board instructed Adams not to retaliate against Plaintiff.[9]

The Board then hired an outside consultant, Jimmy Foreman ("Foreman"), to conduct an independent investigation of Plaintiff's claims.[10] Prior to the investigation, Adams held a staff meeting at the District office, whereupon he informed all staff members

---

[5] Document No. 28, ex. A at 56-59 (Lewis Depo.); id., ex. C at 32, 79-80 (Browder Depo.).

[6] Document No. 28, ex. A at 59-60 (Lewis Depo.).

[7] Document No. 19 at 3 (First Am. Cmplt.); Document No. 28, ex. A-5 (Complaint Letter).

[8] Document No. 28, ex. A at 43-45 (Lewis Depo.).

[9] Id., ex. B at 32 (Adams Depo.); id., ex. C at 43 (Browder Depo.); id., ex. D at 80-81 (Bailes Depo.).

[10] Id., ex. A at 81 (Lewis Depo.); id., ex. C at 43 (Browder Depo.).

that a complaint had been filed, that Foreman would investigate it, and that all staff should "be nice" to Foreman.[11] He did not tell any employees who made the complaint or its contents.[12]

Foreman's report confirmed that the District had not sent the required Notices of Appraised Value; he concluded that Adams's instruction not to divulge this failure to taxpayers seeking to protest amounted to an "abuse of authority," and added that Adams must "insure that everyone who desires 'Due Process' and is entitled to 'Due Process' under the law should have that opportunity."[13] Foreman's report also concluded that Adams had improperly granted one late application for agricultural use while denying all others, and that some employees were appraising their own and their family's property, which could at the least create the appearance of impropriety.[14]

In response, the Board on March 3, 2009 issued to Adams a list of "strongly-worded directives,"[15] which included the following:

---

[11] Id., ex. A at 81-82, 148-49 (Lewis Depo.); id., ex. B at 51, 57-58, 71 (Adams Depo.).

[12] Id., ex. A at 82, 149 (Lewis Depo.); id., ex. B at 71-72 (Adams Depo.).

[13] Id., ex. C-3 at 1.

[14] Id., ex. C-3 at 2, 8.

[15] Document No. 28 at 9; id., ex. C-4

4

11. Insure that each taxpayer who desires "Due Process" is provided the opportunity to receive "Due Process." Insure that equal rights are extended to all taxpayers.

12. All information considered public records should be made available to the public. Understand and accept that instructing office staff not to divulge public information is an abuse of authority.[16]

The Board further directed Adams to ensure that a professional environment existed at the District office and that all employees were treated fairly.[17]

Plaintiff alleges that the District and Adams either created or knew of and failed to correct a hostile work environment in retaliation for her complaint. With respect to Adams, Plaintiff alleges that he engaged in several acts of retaliatory conduct, including: (1) requiring that documents she prepared be reviewed by a coworker prior to entry into the system[18]; (2) on one occasion, providing Plaintiff with a stack of deeds on short notice that Plaintiff had to rush to enter on time[19]; (3) on two occasions, asking Plaintiff to sign a notice of acknowledgment regarding expectations and deadlines for work product, while refusing

---

[16] Id., ex. C-4 at 1.

[17] Id., ex. D at 51-52 (Bailes Depo.).

[18] Document No. 27, ex. 2 at 69 (Lewis Depo.); Document No. 33, ex. C at 169-71 (Lewis Depo.).

[19] Document No. 27, ex. 2 at 140 (Lewis Depo.).

Plaintiff's demand that he sign a similar acknowledgment[20]; (4) telling Plaintiff, when she approached him about her complaint, that he did not agree with all of her assertions and that he was upset with her for not first coming to him[21]; and (5) undermining Plaintiff's decision-making authority with respect to her subordinates by directing that they prioritize a task for Adams over a task for Plaintiff.[22]  Plaintiff also alleges that her coworkers ostracized her.[23]  Moreover, Adams failed to take action to stop Plaintiff's mistreatment at the hands of her coworkers,[24] and contributed to the ostracization "by his demeanor[,] . . . body language, [and] lack of interaction."[25]

Plaintiff submitted a letter to the Board on March 23, 2009, in which she alleged that she had been treated with "malicious bias by the Chief Appraiser, and the majority of [her] colleagues."[26] The Board again directed Adams to ensure that all his employees

---

[20] Id., ex. 2 at 185-86 (Lewis Depo.).

[21] Id., ex. 2 at 147 (Lewis Depo.).

[22] Document No. 32 at 8; Document No. 33, ex. C at 164 (Lewis Depo.).

[23] Document No. 32 at 10.

[24] Document No. 27, ex. 2 at 153-54 (Lewis Depo.).

[25] Document No. 33, ex. C at 163 (Lewis Depo.).

[26] Document No. 28, ex. A-2.

treated each other professionally, and specifically that no malice toward Plaintiff was to be tolerated.[27]

One month later, in an email time-stamped 10:00 p.m. on April 23, 2009, Plaintiff tendered her resignation "due to harassment from co-workers and the lack of professional managements [sic] intervention to prevent or discourage the conflicts."[28] She filed this suit 91 days later, on July 23, 2009. Both defendants seek summary judgment, asserting: Plaintiff's complaint was not protected speech under the First Amendment; that she suffered no adverse employment action because as a matter of law there was no hostile work environment and no constructive discharge; and that her Texas Whistleblower Act claim is time-barred. Adams also asserts qualified immunity, while the District contends that Plaintiff has made no showing of an official policy or custom of indifference toward her rights necessary to establish its liability.

## II.  Summary Judgment Standard

Rule 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

---

[27] Id., ex. D at 48-49 (Bailes Depo.).

[28] Document No. 19 at 5 (First Am. Cmplt.); id., ex. B.

matter of law." FED. R. CIV. P. 56(c). The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the

standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

III. Discussion

A.  Texas Whistleblower Act

An employee suing for retaliation under the Texas Whistleblower Act "must sue not later than the 90th day after the date on which the alleged violation of this chapter: (1) occurred; or (2) was discovered by the employee through reasonable diligence." TEX. GOV'T CODE ANN. § 554.005. A constructive discharge claim accrues in Texas when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign. Univ. of Tex. Med. Branch at Galveston v. Hohman, 6 S.W.3d 767, 774 (Tex. App.--Houston [1st Dist.] 1999, pet. dism'd w.o.j.). Courts interpret this as equivalent to when a plaintiff tenders her resignation "because, by that date, [she] had decided that 'conditions were so intolerable that [she] felt compelled to resign.'" Id. (quoting Davila v. Lockwood, 933 S.W.2d 628, 630 (Tex. App.--Corpus Christi 1996, no pet.)).

Although Plaintiff states in her First Amended Complaint that she sent her resignation email "[o]n Thursday, April 23, 2009 at 10:00 p.m.," she now argues that three emails she received in

9

response to that email--which some of the email recipients sent to acknowledge receipt of the email--create a fact issue regarding when the email was sent.[29]  However, a party's "formal concession in the pleadings or stipulations" constitutes a judicial admission, which is "binding on the party" and has the "effect of withdrawing a fact from contention."  Martinez v. Bally's La., Inc., 244 F.3d 474, 476 (5th Cir. 2001); *see also* White v. ARCO/Polymers, Inc., 720 F.2d 1391, 1396 (5th Cir. 1983) ("Normally, factual assertions in pleadings and pretrial orders are considered to be judicial admissions conclusively binding on the party who made them.").

Plaintiff's Texas Whistleblower Act claim is therefore time-barred because it was filed 91 days after Plaintiff admits she tendered her resignation.[30]

---

[29] *See* Document No. 32 at 10-11.

[30] Moreover, the record demonstrates that the email replies fail to create a genuine issue of material fact even absent Plaintiff's judicial admission.  In each of the reply emails, Plaintiff's original email text and header appear as part of the message history generated in the recipient's reply.  One reproduced time-stamp shows Plaintiff's email as having been sent at 10:00 p.m. on Thursday, April 23; another at 12:00 a.m. on Friday, April 24; and another at 12:01 a.m. on Friday, April 24.  *See* Document No. 33, exs. H, I, J.  However, the timestamp on Plaintiff's original email itself, a copy of which is attached to Plaintiff's First Amended Complaint, is 10:00 p.m.  *See* Document No. 19, ex. B.  The time-stamps reproduced in the body of the subsequent email replies fail to refute the time-stamp on Plaintiff's *actual* message.  Moreover, the text of her letter of resignation states that it is her "official two-week notice of resignation effective April 23, 2009."  Document No. 19 at 5.  The purpose behind tender of resignation being the accrual of a constructive discharge action is to identify the time at which "the party knows of [her] injury," as any acts committed by a plaintiff's employer that made

B.   Section 1983

Plaintiff asserts that her First Amendment rights were violated by Defendants while acting under color of state law, in violation of 42 U.S.C. § 1983. Specifically, she asserts that her complaint to the Board was constitutionally protected free speech, and that the complaint motivated the actions that led to her constructive discharge.

To recover on a First Amendment retaliation claim under section 1983, Plaintiff must show that: (1) she suffered an adverse employment action; (2) the speech in question was a matter of public concern; (3) her interest in commenting on matters of public concern outweighs the public employer's interest in efficiency; and (4) the speech motivated the adverse employment action. DePree v. Saunders, 588 F.3d 282, 286-87 (5th Cir. 2009).

However, "before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job." Davis v. McKinney, 518 F.3d 304, 312 (5th Cir. 2008) (quoting Mills v. City of Evansville, 452 F.3d 646, 647 (7th Cir. 2006)); see also Garcetti v. Ceballos, 126 S. Ct. 1951, 1960

---

conditions so intolerable as to compel resignation "must necessarily have occurred prior to that date." Stroud v. VBFSB Holding Corp., 917 S.W.2d 75, 81 (Tex. App.--San Antonio 1996, writ denied). Because Plaintiff specifically stated her resignation was effective April 23, 2009, any acts allegedly causing that resignation must necessarily have occurred by that date.

(2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). The focus of this inquiry is not on the content of the speech, but on "the role the speaker occupied when [she] said it." Davis, 518 F.3d at 312 (quoting Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 692 (5th Cir. 2007)). The distinction is between "speech that is 'the kind of activity engaged in by citizens who do not work for the government,' . . . and activities undertaken in the course of performing one's job." Williams, 480 F.3d at 693 (quoting Garcetti, 126 S. Ct. at 1962). "Even if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the worker's official duties." Id. at 692 (citing Garcetti, 126 S. Ct. at 1960). Moreover, even if speech is "not necessarily required" by an employee's job duties, it is not protected if it is sufficiently related to them. Charles v. Grief, 522 F.3d 508, 513 (5th Cir. 2008) (discussing Williams, 480 F.3d at 693).

A number of factors guide a court in determining whether an employee is speaking pursuant to her official duties: the relationship between the topic of the speech and the employee's job; whether the employee spoke internally up the chain of command at her workplace; and whether the speech resulted from special

knowledge gained as an employee. *See* Davis, 518 F.3d at 312-14; *see also* Gentilello v. Rege, No. 3:07-CV-1564-L, 2008 WL 2627685, at *3 (N.D. Tex. June 30, 2008). Whether an employee is speaking as a citizen or pursuant to her employment is a question of law for the Court to resolve, even though it "involves the consideration of factual circumstances surrounding the speech at issue." Charles, 522 F.3d at 513 n.17.

    1.    <u>Plaintiff's Communications and Employment Duties</u>

Plaintiff made several accusations in her complaint letter:

(1) Adams was aware that Notices of Appraised Value for 2008 were not generated for several taxpayers, but he nonetheless instructed employees not to divulge this to the public.

(2) Adams permitted one man to apply for an agricultural exemption late upon the request of a Board member, although this was not normal policy for the District.

(3) Adams wanted Plaintiff's department to begin mailing letters notifying property owners of exemption or special use removals due to ownership transfers, although surrounding counties did not do so; since such removals are usually due to move-outs, the mail would likely be returned, and Plaintiff and other employees would then have to track down the proper forwarding address.

(4) While Adams was out of the office once, Plaintiff contacted the District's software provider upon discovering improper treatment of some properties in the District's computer system; Adams was upset when he returned the following week because "all software issues were his department," and the Tax Office would be able to resolve the issue.

13

    (5) Adams "closed out" a group of properties in which Plaintiff was entering information about a property, but refused to reopen it upon her request to complete entering the information; his failure to do so meant "that the Tax Office, and the taxpayer, will receive incomplete information when this group is worked by the Tax Office the first time and more paperwork has to be generated by both offices to complete this task. This is not the only time this has happened due to lack of communication."

    (6) Adams said he would look into running a maintenance process with the District's software that Plaintiff herself offered to run; his failure to run the maintenance process caused Plaintiff and others extra work.

    (7) Other employees were making adjustments that affected property values of their own, family members', and friends' properties.

    (8) Some taxpayers received preferential treatment based on who they knew or who they may be in the community.

    (9) Some employees had so little to do that they surfed the Internet, paid bills, and made personal calls in their spare time, while employees in other departments were "so overloaded with work" that they would likely never catch up; however, employees were "not allowed to interfere with other departments."

    (10) Management was not structured or consistent.

    (11) Several employees were improperly using the District computer system and no efforts were made to distribute online manuals that would educate employees on using the system.[31]

At the time of her complaint letter, Plaintiff was a "customer service manager" at the District, a position she held after being

---

[31] Document No. 28, ex. A-5 (Complaint Letter).

14

a "deed technician," but which she asserts included her old duties as deed technician as well as new duties.[32] Those duties entailed general research at the District; dealing with ownership transfers and address changes; answering customer questions; handling complaints; explaining processes; working with customers to correct errors regarding property information; entering and removing exemptions and special uses; and managing the customer service department.[33] Plaintiff also helped as needed in other areas during the busy protest season, such as by answering phones and printing documents for co-workers.[34]

Furthermore, all District employees were required to comply with the Personnel Policies and Procedures manual adopted by the District's Board of Directors (the "Personnel Policies").[35] Section 11.6.1 of the Personnel Policies states:

> It is the responsibility of every employee, supervisor and director to immediately report suspected misconduct or dishonesty to his or her supervisor or the Chief Appraiser.[36]

---

[32] Id., ex. A at 26, 32-33 (Lewis Depo.).

[33] Id., ex. A at 26, 29, 31-33 (Lewis Depo.).

[34] Id., ex. A at 32 (Lewis Depo.).

[35] Document No. 28, ex. A-4 at SJCAD-0001.

[36] Id., ex. A-4 at SJCAD-0050.

Plaintiff was aware of that policy, and it "did occur" to her when she reported to the Board.[37]

2. <u>Analysis</u>

Plaintiff admitted in her deposition that she viewed her complaint to the Board of Directors as one of the duties of her employment:

> Q. Okay. In fact, the complaint that you made to the board was a complaint that you made pursuant to your duty to report misconduct if you observed it?
>
> A. Yes, sir.
>
> Q. You viewed it as one of the duties of your employment to report to your supervisors what you believed in good faith to be a violation of law, true?
>
> A. Yes, sir.[38]

Moreover, Plaintiff provides no argument in response to the District's assertion that her speech is not protected.[39] Thus, as in <u>Garcetti</u>, Plaintiff effectively has admitted that her speech was made pursuant to her official duties as an employee of the District. *See* 126 S. Ct. at 1960 (citing the plaintiff's statement

---

[37] <u>Id.</u>, ex. A at 77 (Lewis Depo.).

[38] <u>Id.</u>, ex. A at 77-78 (Lewis Depo.).

[39] *See* Document No. 32.

in his brief that he "does not dispute that he prepared the memorandum 'pursuant to his duties as a prosecutor'").

Even absent Plaintiff's admission in her deposition and lack of contention in her briefing, the same result would be reached. Plaintiff communicated all of her allegations to members of the District's Board of Directors, which governs the Appraisal District[40]; thus, all of Plaintiff's communications were internal and were made to superiors in her chain of command.[41]  *Cf.* Davis, 518 F.3d at 315-16 (communications from University of Texas Health Science Center audit employee to the Chancellor of the University of Texas System held to be internal where information about reporting within the UT System demonstrated that the Chancellor attended meetings at which summaries of audit findings and recommendations were presented).  Indeed, Plaintiff understood the Board had oversight of the Appraisal District and the power to hire and fire Adams, the chief appraiser.[42]

---

[40] *See* TEX. TAX CODE ANN. §§ 6.03(a), (c), (d) (stating that an appraisal district is governed by a board of directors, and outlining the appointment processes for members of the board).

[41] Plaintiff's letter was published in the San Jacinto News Times, but not until after she resigned her employment.  *See* Document No. 33, ex. C at 137-38 (Lewis Depo.).  Thus, this publication could not have formed the basis of any retaliation, and is therefore irrelevant to the Court's analysis.

[42] Document No. 28, ex. A at 39 (Lewis Depo.).  Plaintiff appropriately reported to the Board of Directors, not to her supervisor or to the chief appraiser as specified in the Personnel Policies, because Adams himself, who was the subject of many of Plaintiff's complaints, was both Plaintiff's supervisor and the

All topics in the complaint letter relate either directly to Plaintiff's specific functions, to the internal management of her office, or to Adams's acts of impropriety as chief appraiser that she learned of in the course of discharging her own duties as an employee and which as an employee she reported to higher authority in her chain of command. Thus, she made her complaint not in the role of a concerned citizen, but as a District employee who was adhering to the District's Personnel Policies by reporting to higher authority in her own chain of command alleged misconduct and improprieties that she learned of in connection with her own employment and job responsibilities. This is not protected First Amendment speech. *See* Williams, 480 F.3d at 690-91; Sillers v. City of Everman, Tex., No. 4:08-cv-055-A, 2008 WL 2222236 (N.D. Tex. May 13, 2008). Because Plaintiff's speech was not protected, her First Amendment claims fail as a matter of law. Defendants' additional reasons for summary judgment need not be addressed.

---

chief appraiser. The Personnel Policies states in relevant part:

> Supervisors and managers, while appropriately concerned about "getting to the bottom" of such issues, should not in any circumstances perform any investigative or other follow up steps on their own . . . . All relevant matters, including suspected but unproved matters, should be referred immediately to those with follow up responsibility.

It was the Board that had follow-up responsibility to investigate the accusations against Adams, which it did by hiring an independent auditor to investigate Plaintiff's concerns.

IV.   Order

Based on the foregoing, it is

ORDERED that Defendant Clayton Adams's Motion for Summary Judgment (Document No. 27) and San Jacinto County Appraisal District's Motion for Summary Judgment (Document No. 28) are both GRANTED, and Plaintiff's claims against both Defendants are DISMISSED on the merits.

The Clerk will enter this Order, providing a correct copy to all parties of record.

SIGNED at Houston, Texas, on this 23rd day of September, 2010.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE